# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### ABERDEEN DIVISION

BRANDON GARRETT                                                              PLAINTIFF

V.                                                                NO. 1:16-CV-197-DMB-DAS

CITY OF TUPELO, MISSISSIPPI                                                  DEFENDANT

## OPINION AND ORDER

This employment discrimination action is before the Court on the City of Tupelo's motion for summary judgment. Doc. #44.

## I
## Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper only when the record demonstrates that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Luv N' Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016). "A factual issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and material if its resolution could affect the outcome of the action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226 (5th Cir. 2015) (quotation marks omitted). On a motion for summary judgment, a court must "consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Edwards v. Cont'l Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016).

In seeking summary judgment, "[t]he moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quotation marks and alterations

omitted).  If the moving party satisfies this burden, "the non-moving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id*. (quotation marks omitted).  "Where the nonmoving party bears the burden of proof at trial, the moving party satisfies this initial burden by demonstrating an absence of evidence to support the nonmoving party's case."  *Celtic Marine Corp. v. James C. Justice Cos., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).

## II
## Factual Background and Procedural History

### A.  Brandon Garrett's Hire and Health Problems

In 2003, Brandon Garrett graduated from the University of Mississippi with a degree in Criminal Justice.  Doc. #70-1.  Approximately a year later, on June 15, 2004, Garrett joined the Tupelo Police Department's Patrol Division.  Doc. #70-2 at 10–11.

In March 2006, after about two years in the Patrol Division, Garrett requested and received a transfer to the Criminal Investigations Division ("CID"), which operated out of a building located at 324 Court Street ("324 Building").  *Id*. at 17, 36.  This transfer resulted in Garrett receiving a change of title from "Police Officer" to "Detective," a clothing allowance of $75 a month, and a "special division" pay increase of $100 a month.  *Id*. at 18–19.  But for some "personality conflicts" with some of his supervisors, there were no issues with Garrett's work performance, and he was eventually promoted to sergeant in 2013 or 2014.  Doc. #70-3 at 11; Doc. #70-2 at 20–21.

At an unknown time, the roof of the 324 Building began to leak.  *See* Doc. #70-2 at 32.  The leak was severe enough to require the CID to place twelve buckets throughout its office to catch water when it rained.  *Id*.  Beyond the leaks, Garrett observed both an odor and black and green substances growing in the building.  *Id*.

Beginning in 2006, Garrett began taking Zyrtec D "almost every day" to help him breathe. Doc. #70-2 at 33. Then, starting in January 2009, Garrett began experiencing additional respiratory problems, for which he was eventually prescribed Cefzil. *See* Doc. #44-2 at 73–79. Over the ensuing years, Garrett regularly complained of sinus infections, headaches, coughing, sore throats, congestion, malaise and fatigue. *See generally* Doc. #44-2. Garrett also complained of impotence and irritable bowel syndrome. *Id.* at 73–74.

### B. Move from 324 Building

Toward the end of 2014, Garrett noticed that "everybody in the division was sick, including our captain and lieutenant and all the way down. We were all sick over and over and over with repeated sinus infections …." Doc. #70-2 at 33–34. Accordingly, on or about December 2014, Garrett spoke with Bart Aguirre, the Chief of Police, regarding mold exposure. *Id.* at 32.; Doc. #70-3 at 13–14. After receiving the complaint, Aguirre contracted with Mold, Inc. to perform mold testing on the 324 Building, a nearby building located at 320 Court Street ("320 Building"), and a building located on Front Street ("Front Street Building"). *Id.* at 13, 16–18. Mold, Inc. determined there was mold at the 324 Building and the Front Street Building. *Id.* at 17.

In March 2015, Aguirre decided to move the CID to the 320 Building. *Id.* at 15. Aguirre made this decision because he wanted to move the detectives to "a more comfortable work environment that didn't have a mold issue." *Id.* Approximately a month later, in April, Aguirre moved the CID to a structure located on Lemons Drive known as the "Airport Building." *Id.* at 15–16. The other units in the department, with the exception of the Narcotics Division, also made the move. Doc. #70-2 at 39–40.

As a part of the move to the Airport Building, Mold, Inc. provided police personnel a solution to be used to wipe down hard surfaces or paper products before transfer to the new facility.

Doc. #70-3 at 19–20. The Police Department provided employees gloves and masks, and each employee was responsible for wiping down his or her own furniture. *Id*. The Street Crime Unit was responsible for physically moving all items. Doc. #70-2 at 39. However, during the move, Garrett observed members of the Street Crime Unit moving cabinets without wiping them down. *Id*. at 43. It is unclear who was responsible for wiping down filing cabinets and their contents.

### C. Garrett's Transfer to Patrol Division

On March 24, 2015, before the move to the Airport Building was complete, Garrett presented to Karen Maltby, M.D., at the North MS Allergy and Asthma Center for an initial visit. Doc. #44-5. Garrett informed Maltby that "for many years" he experienced "difficulty with nasal congestion and drainage, sneezing, postnasal drip" and that he had been "working in an office with copious amounts of mold, and has had worsening malaise, neck pain, fatigue, respiratory infection." *Id*. at 1. Maltby performed skin testing and observed no "significant sensitivities." *Id*. at 3.

Almost one month after his visit with Maltby, Garrett traveled to MBMC-Baptist Premier for an evaluation of mold exposure by William Frazier, MD. Doc. #44-6. Garrett informed Frazier that he had previously experienced "significant symptoms of fatigue, lethargy, recurrent sinus infection, GI complaints … and skin rash." *Id*. at 1. Garrett further stated that after the move to the Airport Building, "most of his symptoms disappeared" but that "since some of the equipment … has been moved to the new building, he has noticed a recurrence of … nasal congestion, neck pain, and general malaise and fatigue." *Id*. At the evaluation, Frazier observed Garrett had "completely normal" pulmonary function, a "completely normal" chest x-ray, and a "completely normal" sinus CT scan. *Id*. at 2. Additionally, Frazier found "no evidence of current pneumonia, sinusitis, or asthma" and concluded "that at the current time [Garrett] is exhibiting no symptoms

related to mold exposure." *Id.* Ultimately, because Garrett's symptoms alleviated after removal from the 324 Building, Frazier recommended that Garrett "stay out of any environment that has mold because of his reaction to this exposure." *Id.*

Shortly after his visit with Frazier, Garrett spoke with Aguirre about transferring to an instructor position at the police academy. Doc. #70-3 at 25. Aguirre then instructed Garrett to submit a written request for transfer. *Id.*

On April 27, 2015, Garrett wrote to Aguirre and Deputy Chief Allen Gilbert, stating:

> Please accept this letter as my request for a lateral transfer. I wish to transfer from the Criminal Investigation Division to the North Mississippi Law Enforcement Training center. Due to my current health problems revolving around mold exposure symptoms, I was advised by one of my health care providers that I should not put myself back into a mold exposed environment. This is not possible at CID due to contaminated items being brought into the new Airport Headquarters. I have already experienced multiple symptoms in the new facility after our equipment, furniture, and supplies arrived without proper cleaning and disinfecting. I have chosen the NMLETC due to all the training and skills I have developed and specialized in over the past 10 years. I feel that the department can best utilize those skills in the form of me teaching fellow law enforcement officers. I also view this transfer as a change of environment. I feel that a mold free environment will allow me to better focus on healing and getting my body back to normal. I have a great passion for investigations and our investigation division. It brings me great distress to ask for this transfer. I hope that when I am healed, I may be given the opportunity to return to investigations in the future.

Doc. #70-12. After submitting this transfer request, Garrett "was pulled into" an office with Gilbert and Captain Jerry Davis. Doc. #70-2 at 81. Gilbert informed Garrett that the Police Department had "done everything we can do here; we're going to send you to patrol." *Id.* Garrett told Gilbert that he was not interested in going to patrol or losing his job with the CID. *Id.*

Unknown to Garrett, there was a PT instructor position available at the academy. Doc. #70-3 at 25–26. However, the position was non-supervisory and Aguirre believed that Garrett, a supervisory officer, would not accept a demotion to accept the position. *Id.* Ultimately, Aguirre formally responded to Garrett's request for a transfer through a May 8, 2015, memorandum which

stated:

> I have received your request for lateral transfer from the Investigation Division to the Training Center. You have cited as the reason for this request your health condition related to mold exposure. Before I can review your request, you will need to process a first report of injury for workman's compensation purposes if you believe this exposure is work-related. This will initiate the claims process wherein you, your treating physician, the department and our workman's compensation carrier can determine what work place restrictions you have in order to evaluate temporary or permanent reassignment to a position, if available, to meet those restrictions.

Doc. #48-13.

On May 21, 2015, Garrett presented to Bonnie Baggett, CFNP, complaining of itchy eyes, nasal congestion, a sore throat, weakness, and fatigue. Doc. #44-2 at 29. Approximately two weeks after this visit, on June 2, 2015, Garrett, consistent with Aguirre's direction, submitted to the City a completed "Accident Report Form." Doc. #70-27. The form listed the "Type of Injury" as "mold exposure" beginning on March 1, 2006. *Id*. In the form, Garrett stated that the City could have avoided his claimed injury by putting "a new roof on our building back in the 1990's to avoid years of leaks." *Id*.

Six days after Garrett submitted the form, he was transferred to "Charlie Shift" in the Patrol Division, with such transfer effective June 8, 2015. Doc. #70-2 at 22; Doc. #70-14. This move, which did not involve a reduction in rank, resulted in Garrett losing the clothing and incentive bonuses provided to members of the CID. Doc. #70-2 at 87.

Shortly after Garrett was transferred to the Patrol Division, Aguirre approved the move of two detectives who had also complained about mold—Scott Floyd and Nicole Doss—to work in the building housing the Narcotics Division. Doc. #70-3 at 21–22. According to Aguirre, Floyd and Doss worked independently to find a place in the narcotics building, and then asked if they could work there. *Id*. at 21–24. Aguirre did not consider allowing Garrett to move with Floyd

and Doss because Garrett had already transferred out of the CID. *Id*. at 22. However, Aguirre conceded that if he had "thought about it," he could have put Garrett into another building without requiring a transfer. *Id*. at 23.

### D. Work on Patrol and Request to Return to CID

Although the transfer to the Patrol Division occurred in early June, Garrett went on leave before starting work with the Patrol Division. Doc. #70-2 at 89–90. On June 24, 2015, Aguirre notified Garrett by letter that the Police Department successfully removed the mold from the CID, property room, and hallways of the Airport Building. Doc. #70-19; Doc. #70-2 at 90.

Garrett began work with the Patrol Division on July 6, 2015. Doc. #70-2 at 90. When he started, Garrett was forced to undergo ten weeks of field training under a subordinate officer, Corporal Foreman. *Id*. at 97–98. Garrett believes he was the only sergeant in the Department's history to undergo this type of training after a transfer to the Patrol Division. *Id*. at 98. However, Aguirre testified that it was "not unusual" to have a sergeant trained by a corporal. Doc. #70-3 at 69.

After approximately a week with the Patrol Division, Garrett wrote to Aguirre and Gilbert to request a return to the CID because the since-remediated "contamination was the sole reason for me submitting the original transfer request." Doc. #70-20. Aguirre denied this request because he felt Garrett was "doing an excellent job" with Patrol and was concerned about personality problems between Garrett and his former supervisors in the CID, Lynette Sandlin and Jerry Davis. Doc. #70-3 at 37.

On August 20, 2015, counsel for Garrett wrote to Aguirre and Mayor Jason Shelton to request that the CID be moved to a new building. Doc. #70-21. One week after this letter, Davis issued Garrett a "Documentation Only" write-up for allegedly misplacing a suicide victim's gun

while Garrett was still with the CID in April 2015. Doc. #70-22. The document alleged that "Garrett violated established procedure by not turning evidence into property and maintaining proper documentation and chain of custody." *Id.* In a written response to the write-up, Garrett argued that he did not misplace the gun, that he could not have given the gun to the property officer, and that he had arranged with another detective and the victim's son for the son to pick up the weapon. Doc. #70-23.

Davis explained in his deposition that though he found the gun on June 18 and made the decision to issue a disciplinary action that day, he delayed giving the write-up because he thought Garrett did not come back to work until August 1, and he wanted to discuss the situation with Aguirre and Ben Logan, an attorney for the City. Doc. #70-4 at 50. However, he conceded that he did not discuss the write-up with Logan or Aguirre until after Garrett's attorney contacted the City on August 20, 2015. *Id.* at 47–49.

Upon completing his ten-week field training, Garrett was assigned to a "shift with opposite hours." Doc. #70-2 at 107. Although his shift ordinarily kept him out of the contaminated Airport Building, Garrett had to attend "special meetings" in the structure. *Id.* After attending these meetings, Garrett would "get sick again." *Id.*

For his shift, Garrett was assigned Lee Miller as a co-sergeant. *Id.* Garrett considered Miller to be "lazy" and power-hungry. *Id.* Additionally, Patrol Division officials created confusion by failing to institute a command structure between Miller and Garrett. *Id.* at 107–08.

### E. EEOC Charges and This Action

On September 1, 2015, Garrett filed a Charge of Discrimination with the Equal Employment Opportunity Commission. Doc. #44-14. The charge alleged disability discrimination and unlawful retaliation based on the refusal to transfer the CID to a different

building and based on Garrett's transfer to the Patrol Division.  *Id*.  On January 15, 2016, Garrett filed an amended EEOC Charge alleging disability discrimination based on the City's refusal to transfer him to the Police Academy.  Doc. #70-3 at Ex. 27.

After receiving notification of his right to sue, Garrett filed this action on November 1, 2016.  Doc. #1.

### F.  Requests for Promotion and Later Resignation

Toward the end of 2016 and the beginning of 2017, Garrett applied for a lieutenant position with the Narcotics Division and also for a courthouse guard position.  Doc. #70-3 at 73.  For each position, Garrett was one of two applicants interviewed.  *Id*. at 73–74.  In each instance, Garrett scored lower during the interview than his competitor, and was not selected for the position.  *Id*. at 74.

On March 3, 2017, Garrett, who was on vacation, received a "Documentation Only" write-up from John Moses for missing a training without notifying his supervisor before the training that he had a legitimate reason for his absence.  Doc. #70-25.  At the time of the write-up, Moses, Garrett's supervisor, told Garrett, "they're making me do this."  Doc. #70-2 at 113.  Garrett testified that missing trainings while on vacation had "always been excused in the past," and that this write-up "pushed [him] over" because he could not "afford to have [write-ups] in [his] file."  *Id*. at 114.  In addition to Garrett's write-up, Moses also wrote up Miller, Garrett's co-sergeant, for missing training without notification.  Doc. #44-8 at 33.  Moses himself was written up by his supervisor, Tim Bell, for failing to know the locations of his sergeants.  *Id*. at 33–34.

Garrett resigned approximately one week after the March 2017 write-up.  Doc. #70-2 at 114.  Sometime after his resignation, Garrett went to the Chief of the New Albany Police Department, with whom he had previously discussed possible positions, and said, "I need a job."

*See id*. at 115–16.  Garrett was subsequently hired as a Patrolman with the New Albany Police Department.  *Id*. at 23.  The New Albany Police Department has a building with mold but Garrett is allowed to avoid entering the structure.  *Id*. at 119.

### G.  Subsequent Procedural History

Garrett filed a second charge of discrimination on May 1, 2017.  Doc. #29-4.  This second charge alleges disability discrimination based on failure to promote and constructive discharge.  *Id*.  Garrett received a notice of right to sue for his second charge and, on August 2, 2017, filed a motion to amend his complaint in this action to assert his new claims.  Doc. #27.  United States Magistrate Judge David A. Sanders granted the motion to amend, and Garrett filed his amended complaint on August 3, 2017.  Doc. #29.

Following a period of discovery, the City filed a motion for summary judgment on November 8, 2017.  Doc. #44.  Garrett responded in opposition on November 22, 2017, and the City timely replied.  Doc. #48; Doc. #54.

Due to a deficiency in Garrett's response, this Court struck Garrett's response memorandum and directed the filing of an amended memorandum.  Doc. #69.  Garrett filed an amended memorandum, along with an amended response which includes a document not produced during discovery—a June 21, 2018, affidavit executed by Garrett.  Doc. #70-18; Doc. #71.  The City replied to the amended memorandum and moved to strike the response and accompanying exhibits.  Doc. #76; Doc. #77.  Garrett responded in opposition to the motion to strike on July 6, 2018.  Doc. #82.

### III
### Motion to Strike

The City seeks to strike Garrett's supplemental response and its attached exhibits on the ground that Garrett was only authorized to file a supplemental memorandum, not a supplemental

response.  Doc. #76.  The City specifically objects to the supplemental response's inclusion of Garrett's June 21 affidavit, which it contends is untimely and prejudicial.  *Id*. at ¶ 3.  In response, Garrett argues that filing the amended response was "appropriate because the Amended Response cites the exhibits in the same order in which they are discussed in the Amended Memorandum Brief, thereby avoiding the confusion of citing to the original memorandum brief, which does not have the exhibits in the same order as they are cited in the Amended Memorandum Brief."  Doc. #82 at 1–2.  Garrett further contends that the new affidavit is necessary to address the question of Garrett's alleged disability raised by this Court's recent order in *Jackson v. Oil-Dri Corp. of America*.[1]  *Id*. at 5.

The City is correct that Garrett was not granted leave to file a supplemental response, and Garrett was certainly not granted leave to file new evidence.[2]  Accordingly, the Court has discretion to strike the document and any new evidence.  *See Rashid v. Delta State Univ.*, 306 F.R.D. 530, 534 (N.D. Miss. 2015) (court has inherent power to strike document for violation of court order).  In the exercise of this discretion, the Court will strike the June 21 affidavit because the introduction of new evidence at this late stage in the litigation is clearly prejudicial to the City and because, as explained below, the Court need not reach the issue of Garrett's disability. However, to the extent Garrett's supplemental memorandum cites to exhibits in his supplemental response which were previously filed with his original response, the Court sees no reason to strike such exhibits.  To do so would force the Court to either disregard Garrett's supplemental memorandum and deprive Garrett of a merits determination, or to further delay this case by directing Garrett to submit a second supplemental memorandum citing to his original response.

---

[1] No. 3:16-cv-189, 2018 WL 1996474 (N.D. Miss. Apr. 27, 2018).

[2] In reaching this conclusion, the Court rejects Garrett's unsupported statement that "[f]iling an Amended Response dovetails with filing an Amended Memorandum Brief."

Accordingly, in the interests of efficiency and deciding this case on the merits, the Court declines to strike the supplemental response as a whole. Therefore, the motion to strike will be granted to the extent it asks the Court to strike Garrett's June 21 affidavit but will be denied to the extent it asks the Court to strike the supplemental response in its entirety.

IV

Analysis

Garrett's amended complaint asserts three claims under the Americans with Disabilities Act: (1) failure to accommodate; (2) retaliation; and (3) constructive discharge. Doc. #29 at ¶ 15. The City seeks summary judgment on all claims.

A. Failure to Accommodate

"The ADA requires an employer to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) (quoting 42 U.S.C. § 12112(b)(5)(A) (alterations omitted)). Additionally, "once an employee has made a request for an accommodation, it may be necessary for the employer to initiate an informal, interactive process with the qualified individual with a disability … in order to craft a reasonable accommodation." *Molden v. E. Baton Rouge Parish Sch. Bd.*, 715 F. App'x 310, 315–16 (5th Cir. 2017) (quotation marks omitted). "[A]n employer violates the ADA when the employer's unwillingness to engage in a good faith interactive process *leads to* a failure to reasonably accommodate an employee." *Id.* at 316 (quotation marks omitted).

To prevail on a failure to accommodate claim, a plaintiff must show: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Feist v. La., Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d

12

450, 452 (5th Cir. 2013) (quotation marks omitted). The City argues that summary judgment is warranted on Garrett's reasonable accommodation claim because Garrett is not disabled[3] and, even if he were disabled, he cannot show that the City failed to accommodate him. Doc. #45 at 11–16. Because this Court concludes that Garrett has not shown a failure to accommodate, it need not reach the issue of disability.

"[T]here must be a causal connection between the major life activity that is limited and the accommodation sought." *Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 687 (8th Cir. 2003); *see Felix v. N.Y.C. Transit Auth.*, 324 F.3d 102, 105 (2d Cir. 2003) ("[A]n employer discriminates against an employee with a disability only by failing to provide a reasonable accommodation for the 'disability' which is the impairment of the major life activity."); *Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 605 (1st Cir. 2017) ("The burden is on [the plaintiff] to demonstrate … what specific accommodations she needed *and how those accommodations were connected to her ability to work*.") (emphasis added). "In other words, an accommodation must be sought as a means to alleviate disability-induced limitations that impact an employee's job-related activities." *Hamel v. Bd. of Educ. of Hartford Cty.*, No. 16-2876, 2018 WL 1453335, at *12 (D. Md. Mar. 23, 2018) (collecting cases). In this regard, the City argues that Garrett cannot link his various limitations to the presence of mold and that, therefore, the City's refusal to remove him from the mold environment cannot be deemed a failure to accommodate. Doc. #45 at 14–15. This Court agrees.

"Causation in a mold case is not within common knowledge and expert medical testimony

---

[3] To be "qualified" under the ADA, a plaintiff "must be able to 'perform the essential functions' of [the relevant position] 'with or without reasonable accommodation.'" *Credeur v. La. ex rel. Office of Attorney Gen.*, 860 F.3d 785, 792 (5th Cir. 2017) (quoting 42 U.S.C. § 12111(8)). The City does not dispute that Garrett is or was qualified for his position.

will be required to establish general and specific medical causation." *Pratt v. Landings at Barksdale*, No. 09-1734, 2013 WL 5376021, at \*7 (W.D. La. Sep. 24, 2013). Here, Garrett has offered no admissible[4] expert medical evidence which links his various limitations (malaise, impotence, respiratory infections) to exposure to mold, much less the particular mold at the various buildings. In the absence of such evidence, Garrett cannot show that his requested accommodation—access to a mold-free work environment—is causally linked to his asserted limitations. Accordingly, his claim premised on the failure to provide such an environment must fail. For the same reason, his claim that the City failed to engage in the interactive process, which is derivative of a failure to accommodate claim, must also fail.

## B. Retaliation

In the absence of direct evidence of retaliatory intent, retaliation claims brought under the ADA are evaluated under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*.[5] *Claiborne v. Recovery Sch. Dist.*, 690 F. App'x 249, 259 (5th Cir. 2017) (citing *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999)). Under this approach, a plaintiff must first establish a prima facie case of retaliation. *Feist*, 730 F.3d at 454. If the plaintiff satisfies this burden, the burden shifts to the defendant to state a legitimate, non-retaliatory reason for the challenged action. *Id*. Should the defendant adequately state a non-retaliatory reason, the burden shifts back to the plaintiff to show that the proffered reason is actually pretext for retaliation. *Id*.

Based on his response, Garrett asserts claims for retaliation based on: (1) his transfer to the Patrol Division; and (2) the August 2015 and March 2017 write-ups.[6]

---

[4] This Court has excluded as unreliable references in Garrett's medical records linking his various symptoms to mold exposure. *See* Doc. #68.

[5] 411 U.S. 792 (1973).

[6] To the extent Garrett asserted claims for retaliation based on other adverse actions, the Court deems such claims abandoned due to Garrett's failure to argue such claims in response to the City's motion for summary judgment. *See*

## 1. Transfer

Garrett argues "that the actual reason for the transfer to Patrol was not an attempt to 'accommodate' [him], but, rather, [was] an attempt to retaliate … because of his criticisms of Defendant." Doc. #71 at 18.

### a. *Prima facie case*

"To establish a prima facie case of retaliation under the ADA … a plaintiff must show that (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action." *Feist*, 730 F.3d at 454. With regard to Garrett's assignment-based retaliation claim, the City does not challenge the first or third elements of his prima facie case.[7] Rather, the City argues that "a failure to accommodate does not constitute an adverse employment action because the alleged 'failure' to accommodate does not materially adversely affect Garrett's terms and conditions of employment." Doc. #77 at 13.

Contrary to the City's argument, Garrett's retaliation claim is not based on an amorphous failure to accommodate but rather on what he alleges to be a wrongful transfer to the Patrol Division. "To constitute prohibited retaliation, an employment action must be materially adverse, one that would dissuade a reasonable worker from making or supporting a charge of discrimination." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009) (alterations and quotation marks omitted); *Credeur v. La. ex rel. Office of Attorney Gen.*, 860 F.3d 785, 798 (5th Cir. 2017) (applying *Stewart*'s materiality language in ADA retaliation case). "Under the

---

*Muniz v. El Paso Marriott*, 773 F.Supp.2d 674, 683–84 (W.D. Tex. 2011) ("Plaintiff failed to address these claims in her response to Defendant's Motion. As such, the Court finds Plaintiff has waived the two claims.") (collecting cases).

[7] The Court is skeptical about whether the criticism of the City for failing to install a new roof may qualify as protected activity under the ADA. *See, e.g., Stouch v. Twp. of Irvington*, 354 F. App'x 660, 667 (3d Cir. 2009) (complaint regarding unsafe conditions not protected activity under the ADA). Nevertheless, to the extent the issue has not been raised, the Court declines to address it at this summary judgment stage.

'materially adverse' standard, 'a transfer that does not involve a demotion in form or substance cannot rise to the level of a materially adverse employment action.'" *Sabzevari v. Reliable Life Ins. Co.*, 264 F. App'x 392, 396 (5th Cir. 2008). When considering the form or substance of a transfer, a court should consider whether the transfer affected the plaintiff's "job title, grade, hours, salary, or benefits," or otherwise "resulted in a diminution in prestige or change in standing among … co-workers." *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 709 (5th Cir. 2016).

There is no dispute that the Patrol Division lacked the same benefits and pay as the CID— a seventy-five dollar clothing allowance and a one-hundred dollar special pay increase. There is also no dispute that the Patrol Division job required different working hours than the CID. Under these circumstances, the Court concludes that the transfer to the Patrol Division was not purely lateral and, therefore, was an adverse employment action.

### b. Legitimate non-retaliatory reason and pretext

The City argues that "[t]he decision to reassign Garrett to the Patrol Division (a position at the training Academy for which Garrett was qualified was not available) was based on the mutual desire to remove Garrett from what Garrett characterized was a mold infested environment at the Airport Road location …." Doc. #77 at 11. Garrett does not dispute that an attempt to reasonably accommodate is a legitimate non-retaliatory reason for a transfer. However, he contends that there is a genuine issue of material fact about whether the transfer was pretext for retaliation.

To establish pretext, an employee must "show[] that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Feist*, 730 F.3d at 454. This is accomplished by establishing "'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Id*. Generally, "[a] plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered

explanation is false or unworthy of credence. An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (quotation marks and citations omitted).

Garrett argues he can show pretext because: (1) he was assigned to work with Miller, a known problem officer; (2) he was denied promotions to the Narcotics Division or the Municipal Court; (3) he was placed under a subordinate officer for training; (4) the commanding officer in the Patrol Division, Timothy Bell, was seen by some officers as a difficult supervisor; (5) he was not returned to the CID after the mold problem was remediated; and (6) Aguirre assigned other officers to mold-free buildings without transferring them to the Patrol Division.

First, to the extent Garrett attempts to show disparate treatment based on Aguirre allowing Doss and Floyd to work out of the Narcotics Building, he must establish that Doss and Floyd were "similarly situated employee[s] … under nearly identical circumstances." *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005) (quotation marks omitted). Because it is undisputed that Doss and Floyd specifically requested a move to the Narcotics Building, while Garrett did not, the Court concludes that the two employees, even if similarly situated, were not transferred under nearly identical circumstances so as to raise a genuine issue of material fact as to pretext.

As to Garrett's remaining evidence, the Court finds Garrett's generalized complaints about the Patrol Division, which have no bearing on the decision itself, to be insufficient evidence of pretext. However, it is undisputed that the mold problem which allegedly motivated the transfer was remediated before Garrett actually began with the Patrol Division, albeit after the transfer was officially effective. Given this fact, a reasonable jury could conclude that Garrett's transfer was not for the purpose of reasonably accommodating his alleged mold sensitivity. Accordingly, the Court concludes that Garrett has raised a genuine issue of material fact as to the issue of pretext

for his transfer such that summary judgment on this claim should be denied. *See KHOU-TV*, 850 F.3d at 242 (pretext shown by evidence that proffered reason is unworthy of credence).

## 2. Write-ups

Garrett argues that he "has shown a violation of the anti-retaliation provisions by showing that he received a written documentation within a week after requesting a reasonable accommodation, and has shown that Defendant intended to give Garrett yet another documentation for a non-offense." Doc. #71 at 23.

### a. Prima facie case

The law is clear that a request for a reasonable accommodation is a protected activity under the ADA. *Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008); *see also Haley v. Tiger Trailers, Inc.*, No. 5:18-cv-16, 2018 WL 1722394, at *2 (E.D. Tex. Mar. 19, 2018) (collecting cases). Therefore, Garrett's August 2015 request for accommodation satisfies the first element of his prima facie case.

Second, as a general matter, written warnings are not adverse when "no disciplinary actions flow[] from the[m]." *Credeur*, 860 F.3d at 798. Thus, "a written reprimand, without evidence of consequences, does not constitute an adverse employment action." *Thibodeaux-Woody v. Hous. Cmty. Coll.*, 593 F. App'x 280, 286 (5th Cir. 2014). However, a formal reprimand may be materially adverse when "it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions …" *Millea v. Metro-North R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011).

Garrett argues that his "Documentary Only" write-ups are adverse because they are forms of disciplinary action and disciplinary actions may disqualify an applicant in the Police Department from certain promotions. This Court agrees. Garrett has introduced undisputed evidence that disciplinary actions, defined as any type of action "on paper," prevent a Department employee

from applying for certain positions. Doc. #70-29 at 21. While the evidence also shows that Documentary Only write-ups are removed from an employee's file after six months to a year,[8] the Court concludes that the written reprimands carry with them sufficient consequences to be deemed adverse employment actions.

Third, to satisfy the causal connection element, a plaintiff may show "close timing between an employee's protected activity and an adverse action against him." *Feist*, 730 F.3d at 454 (alterations omitted). A time lapse of four months is sufficient to satisfy the third element while a lapse of five months is not. *Id*.

There can be no dispute that the first write-up, which occurred exactly one week after Garrett's August 20 request for a reasonable accommodation, easily satisfies the temporal requirement. Furthermore, the second write-up came approximately four months after Garrett filed this action. While the second write-up stretches the four-month limit mentioned above, the Court concludes that both write-ups at issue satisfy the temporal proximity requirement of the third element.

### b. Legitimate non-retaliatory reasons and pretext

The City argues that the write-ups were not retaliatory but "were completed in reference to the evidence handling and failure to report for training instances." Doc. #45 at 17. Garrett does not dispute that these are legitimate non-retaliatory reasons but seems to suggest that the Court can infer pretext because the first write-up was "unjustified" and because Moses, Garrett's commanding officer, was expressly directed to give the second write-up for a "non-offense." Doc. #70 at 22–23.

"[A] good faith termination based on neutral reasons—even mistaken reasons—does not

---

[8] *See* Doc. #44-3 at 69.

violate antidiscrimination law. The key inquiry is thus whether [an employee's] supervisor *believed* that [the employee's] actions violated procedure, not whether those actions actually violated such a policy." *Khalfani v. Balfour Beatty Cmtys., L.L.C.*, 595 F. App'x 363, 366–67 (5th Cir. 2014) (footnotes omitted).[9] Here, the record reflects that Garrett was written up for violating evidence-handling procedures and for failing to notify his supervisor that he would be missing a mandatory training. While Garrett also argues that satisfying the evidence handling procedures would have been difficult, if not impossible, he has offered no evidence that he actually complied with the procedures, much less that his supervisor could not have reasonably believed the procedures were followed. Indeed, Davis, Garrett's supervisor, testified expressly that Garrett's explanation regarding the gun did not alter his conclusion that a write-up was warranted. Doc. #44-12 at 22.

Similarly, Garrett has not disputed that he failed to notify his supervisor that he would be missing the mandatory training. Under these circumstances, the Court concludes that Garrett has failed to show the write-ups were unjustified.

However, where a plaintiff engages in conduct before a protected activity but does not receive a disciplinary action until after the protected activity, an unexplained delay in discipline may be "circumstantial evidence … support[ing] the inference of retaliation." *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 850 (7th Cir. 2007). The record reflects that Davis learned of the misplaced gun on June 18, 2015, but did not write up Garrett at the time because he erroneously believed that Garrett was not returning to work until August 1, 2015, and because he wanted to discuss the write-up with his supervisors. Notwithstanding this belief, Davis waited the entire

---

[9] While a sharp decline in treatment after a history of positive reviews may satisfy the pretext standard, *Khalfani*, 595 F. App'x at 366, this rule has never been applied where, as here, the two allegedly erroneous disciplinary actions occurred more than a year apart.

month of August, until after Garrett's attorney requested a reasonable accommodation, to speak with his supervisors and, eventually, issue Garrett a disciplinary write-up. A jury hearing this evidence could reasonably believe that the August 2015 write-up was in retaliation for Garrett's requested accommodation rather than his violation of evidence handling procedures. Therefore, the Court concludes that Garrett has raised a genuine issue of material fact as to pretext regarding the August 2015 write-up and that, therefore, summary judgment on this claim is properly denied. *See Quillen v. Touchstone Med. Imaging LLC*, 15 F.Supp.3d 774, 783 (M.D. Tenn. 2014) ("Given that TMI waited four months to discipline Cripe and did so only after she had spoken up for Quillen, a jury reasonably could infer that TMI disciplined Cripe for attempting to expose (or at least probe) TMI's true reason for reducing Quillen's position to part-time.").

With regard to the March 2017 write-up, Garrett seeks to show pretext on the ground that Moses was directed to issue the write-up. However, this fact does not call into question whether the write-up was issued because Garrett violated a policy requiring that he specifically inform his supervisor if he intended to miss a mandatory training. *See Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 766 (5th Cir. 2016) (employee failed to show pretext for discipline where he "presented evidence that may have called the credence of these reasons into question, [but] did not present any evidence that suggested he did not violate both policies"). Therefore, summary judgment on the retaliation claim based on the March 2017 write-up will be granted.

### C. Constructive Discharge

Garrett argues that he was constructively discharged in retaliation for his complaint criticizing the City for failing to fix the leaks in the building. Doc. #71 at 25.

"A constructive discharge occurs [under the ADA] when 'the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary

resignation.'" *Stringer v. N. Bolivar Consol. Sch. Dist.*, __ F. App'x __, No. 17-60282, 2018 WL 1192999, at *6 (5th Cir. Mar. 7, 2018) (quoting *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 342 (5th Cir. 2005)). To determine whether an employee was forced into an involuntary resignation, a court applies "an objective reasonable employee test which asks whether a reasonable person in the plaintiff's shoes would have felt compelled to resign." *Id.* (quotation marks omitted).

The Fifth Circuit has

identified several factors relevant to constructive discharge, including: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.

*Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338 (5th Cir. 2014). While an employee need not show the employer specifically intended to force his resignation, "constructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Lauderdale v. Tex. Dep't of Criminal Justice, Inst. Div.*, 512 F.3d 157, 167 (5th Cir. 2007) (alteration omitted).

Garrett argues that he was constructively discharged because: (1) he was transferred to Patrol, which required him to miss time with his child, and work with Miller, who would occasionally yell at him; (2) he was denied a return to the CID; and (3) he was given two unjustified write-ups, which effectively foreclosed any promotion potential.

In considering Garrett's claim, the Court notes that his transfer to Patrol was not a demotion. Accordingly, the first factor weighs against a finding of constructive discharge.

There is no dispute that the transfer resulted in a slight reduction in salary. However, insofar as the salary differential ($175 a month, including benefits) is negligible, and the change

occurred nearly two years before the resignation, the Court concludes that the second factor weighs only slightly in favor of a finding of constructive discharge. *See Hill v. K-Mart Corp.*, 699 F.2d 776, 779 (5th Cir. 1983) (finding no constructive discharge where, among other things, "incidents took place long before [the] resignation").

Furthermore, while the transfer involved an inconvenient schedule, there is no evidence it involved a reduction in job responsibilities or amounted to a reassignment to menial or degrading work. Therefore, the third and fourth factors weigh against a finding of constructive discharge. *See Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 755 (5th Cir. 1986) ("[C]onstructive discharge cannot be based upon the employee's subjective preference for one position over another.").

As to harassment, the Court presumes that unjustified write-ups may constitute harassment under the constructive discharge inquiry particularly where, as here, the write-ups carry with them a potential harm to promotion potential. However, for the reasons above, Garrett has not shown that his write-ups were unjustified. Furthermore, even if he could, the write-ups would have only foreclosed a promotion for between six months and a year. *See Junior v. Texaco, Inc.*, 688 F.2d 377, 380 (5th Cir. 1982) ("Junior's chances for advancement may have been hampered by the low appraisal, especially for the short run. But the co-employee's testimony, as well as Junior's own experience in 1975, belies a finding that the evaluation at that stage was permanent or irreversible."), *abrogated on other grounds by Cortes v. Maxus Expl. Co.*, 977 F.2d 195, 200 (5th Cir. 1992). Additionally, while it appears Miller would yell at Garrett, there is no evidence this occurred so frequently as to rise to the level of a hostile work environment, much less a constructive discharge. *See Webb v. Sw. Bell Tel., L.P.*, No. 03-ca-1271, 2004 WL 2905255, at *5 (W.D. Tex. Dec. 16, 2004) ("Plaintiff's evidence of hostility, threats, and yelling by [supervisor], as well as evidence that [supervisor] resorted to confronting her outside a restaurant about a coffee

break, changed the designation of certain illness days, blocked her path into his office and apparently bumped her chest with his chest, and visited her home to check whether Plaintiff was actually sick is not sufficient to establish that a reasonable person would have felt compelled to resign in Plaintiff's situation."). Accordingly, the fifth factor also weighs against a finding of constructive discharge.

Finally, there is no evidence Garrett was offered early retirement. Accordingly, the sixth factor weighs against a finding of constructive discharge.

In sum, the bulk of the factors weigh against a finding of constructive discharge. Therefore, the Court concludes that Garrett was not constructively discharged and that summary judgment is warranted on his constructive discharge claim.

## V
## Conclusion

For the reasons above, the City's motion to strike [76] is **GRANTED in Part and DENIED in Part**. The motion is GRANTED to the extent it seeks to strike Garrett's June 21, 2018, affidavit. The motion is DENIED to the extent it seeks to strike Garrett's supplemental response in its entirety.

The City's motion for summary judgment [44] is **GRANTED in Part and DENIED in Part**. The motion is DENIED to the extent it seeks summary judgment for Garrett's retaliation claims premised on his transfer to the Patrol Division and his August 2015 write-up. The motion is GRANTED in all other respects.

    **SO ORDERED**, this 6th day of July, 2018.

                           /s/Debra M. Brown
                           **UNITED STATES DISTRICT JUDGE**